IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHERYL STREET, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 06 C 2963 |
| v. ) | |
| ) | |
| INGALLS MEMORIAL HOSPITAL, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge:

On December 21, 2006, Plaintiff Cheryl Street filed a three-count First Amended Complaint alleging disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, against her former employer, Defendant Ingalls Memorial Hospital ("Ingalls") and two claims pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, against Ingalls as a plan administrator and fiduciary. In a previous order, the Court dismissed Count II of Street's First Amended Complaint because ERISA did not govern the applicable short-term disability policy at issue. The Court also dismissed Street's claims for monetary relief in Count III of the First Amended Complaint and granted Street leave to amend her long-term disability claim. In the her Second Amended Complaint, Street alleges a failure to accommodate claim under the ADA, but does not re-allege her long-term disability claim.

Before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) regarding Street's failure to accommodate claim. For the following reasons, the Court denies both Ingalls' and Street's summary judgment motions because there are

genuine issues of material fact for trial.

## BACKGROUND

### I. Northern District of Illinois Local Rule 56.1

When determining summary judgment motions, the Court derives the background facts from the parties' Local Rule 56.1 statements. Local Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). The purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006); *Solaia Tech. LLC v. Arvinmeritor, Inc.,* 361 F.Supp.2d 797, 826-27 (N.D. Ill. 2005).

A litigant's failure to respond to a Local Rule 56.1 statement results in the Court admitting the uncontroverted statement as true. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). In addition, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon,* 233 F.3d at 528. Finally, the Court may disregard statements and responses that do not properly cite to the record. *See Cichon v. Exelon Generation Co., L.L.C.* 401 F.3d 803, 809-10 (7th Cir. 2005); *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997). With these standards in mind, the Court turns to the relevant facts of this case.

### II. Relevant Facts

#### A. Parties

Ingalls has approximately seven medical care facilities in the Chicago area and its main campus is located in Harvey, Illinois. (R. 102-1, Def.'s Rule 56.1 Stmt. Facts ¶ 3.) Since 1971,

Street has been a registered nurse licensed to practice in Illinois. (R. 121-2, Pl.'s Rule 56.1 Stmt. Facts ¶ 3.) In October 2002, Street began working at Ingalls as an urgent aid nurse. (*Id.* ¶ 5; Def.'s Stmt. Facts. ¶ 4.) After approximately eleven months, Ingalls promoted Street to the RN Case Manager position for the Occupational Medicine Departments at Ingalls' Calumet City and Tinley Park Family Care Centers, which was the position Street held until Ingalls terminated her employment in March 2005. (Pl.'s Stmt. Facts ¶ 5; Def.'s Stmt. Facts ¶ 5.)

### B. RN Case Manager Job Description

The job description for the RN Case Manager position provides:

**POSITION REQUIREMENTS**
Physical/mental demands described below are representative of those that must be met by an employee to successfully perform the essential functions of the job. Ingalls Hospital will make reasonable accommodations to allow employees with disabilities to perform the essential functions. While performing the duties of this job, the employee is frequently required to:

- Assist patients of varying physical ability and size in the movements required for clinical care.

- Perform clinical duties consistent with standard nurse practice.

- File, operate a computer, complete paperwork.

- Communicate with co-workers, patients, physicians, etc.

- Work varying shifts, which may include days, evenings, weekends, holidays. Schedules and shifts may rotate.

- Provide service in a friendly, calm, professional manner to all internal and external customers in situations which may be stressful, tense and ambiguous.

(R. 136-1, Def.'s Stmt. Add'l Facts ¶ 8.)

### C. Street's Specific Job Duties as RN Case Manager

As RN Case Manager, Street supervised medical assistants working in the Occupation

3

Medicine Department. (Pl.'s Stmt. Facts ¶ 11.) As part of her job duties, Ingalls expected Street to review patients' medical records at the Tinley Park, Calumet City, and main campus locations, set up appointments if necessary, and discuss the cases with the applicable medical officers. (Def.'s Stmt. Facts ¶ 9.) Approximately two days a week, Street would drive to the main hospital in Harvey to obtain patient files and take those files to either Calumet City or Tinley Park. (Pl.'s Stmt. Fact ¶ 12.) Street also had the duty as RN Case Manager to assist patients of varying physical ability and size in the movements required for clinical care, including physically assisting them. (Def.'s Stmt. Add'l Facts ¶ 9.) Ingalls also required Street to assist with patient care at the Calumet City and Tinley Park facilities if the volume of patients was high and when there were staffing shortages. (Def.'s Stmt. Facts ¶ 14.) Under the second job requirement listed above, "perform[ing] clinical duties consistent with the standard nurse practice," Street was required to assess patients by taking patients' vital signs, hooking patients up to monitors, prepping wound sites, and generally following the doctor's orders with regard to treatment. (Def.'s Stmt. Add'l Facts ¶ 10; Ex. F, Papp Dep., at 55-56.)

### D. Street's Injury

On March 22, 2004, Street was walking in the urgent aid department of Ingalls' Tinley Park location when she caught her foot on something sticky and fell suffering a fracture of the distal right femur three inches above the knee that was complicated by osteoporosis. (*Id.* ¶ 20; Pl.'s Stmt. Facts ¶ 16.) That same day, Dr. William Earman performed surgery to close the fracture site above the knee. (Pl.'s Stmt. Facts ¶ 17.) Dr. Earman also placed a rod inside Street's femur to maintain alignment of the fragments. (*Id.*) On March 25, 2004, Street was transferred from the hospital to the Ingalls Rehabilitation Center where she underwent physical therapy until April 1, 2004, at which time she was discharged. (*Id.*; Def.'s Stmt. Facts ¶ 21.) On July 29, 2004,

4

Dr. Earman performed an arthroscopy on Street's right knee and encountered severe arthrosis (excessive wearing away of the layers of cartilage on the bone) and delayed union, as well as scarring in the supracondylar pouch (sac containing synovial fluid covering patella) and adhesions. (Pl.'s Stmt. Facts ¶ 20.)

### E. Ingalls' Leave Policies

On May 21, 2004, Ingalls approved Street's request for leave under the Family Medical Leave Act ("FMLA") applying retroactively to the date of her injury. (Def.'s Stmt. Facts ¶ 31.) Ingalls' employees are eligible to take up to twelve weeks of unpaid family/medical leave within any twelve month period and be restored to the same or equivalent position upon the employee's return from FMLA leave. (*Id.* ¶ 32.) If an Ingalls' employee does not return to work at the end of the twelve weeks of approved FMLA leave, Ingalls will not hold open the employee's original position. (*Id.* ¶ 33.) After an employee's FMLA leave expires, Ingalls' policy provides that the employee may remain on an extended leave for a maximum of one year from the date the employee's absence began. (*Id.* ¶ 34.)

On July 14, 2004, Ingalls informed Street that – in accordance with its policy – because her FMLA leave of absence had extended beyond twelve weeks, Ingalls was no longer required to hold Street's RN Case Manager position open for her. (*Id.* ¶ 36.) Ingalls, however, indicated that its policy permitted Street to remain on an extended leave of absence for up to one year from the date Street's absence began, but that if she remained on leave after that, Ingalls would terminate her employment pursuant to its policies. (*Id.* ¶ 37.)

### F. Street's September 2004 Attempt to Return to Work

When an Ingalls' employee wishes to return to work after being out on leave for a personal injury, the employee must provide a doctor's note or other evidence that the employee is

5

physically able to return to work.  (*Id.* ¶ 38.)  Ingalls' employee handbook informs employees that "[y]our supervisor may also require that you obtain clearance from the Hospital's Occupational Health Services at any time deemed appropriate, or, if your ability to perform required duties is at question."  (*Id.* ¶ 39; Pl.'s Stmt. Facts ¶ 31.)  Pat Wilderspin, a Nurse Manager in the Occupational Health Service, assists Ingalls' employees return to work after a leave of absence.  (Def.'s Stmt. Facts ¶ 41; Pl.'s Stmt. Facts ¶ 32.)

On September 27, 2004, Wilderspin met with Street because Street wanted to return to work.  (Def.'s Stmt. Facts ¶ 44; Pl.'s Stmt. Facts ¶ 32.)  Street brought a note from Dr. Earman that stated:  "Pt. may return to work, minimal walking, no greater than 100 ft.  No stairs.  Use wheelchair or walker or cane."  (Def.'s Stmt. Facts ¶ 46; Pl.'s Stmt. Facts ¶ 21.)  Moreover, Street attended the meeting in a wheelchair.  (Def.'s Stmt. Facts ¶ 45.)  At that time, Wilderspin did not give Street clearance to return to work.  (*Id.* ¶ 48.)

At her deposition, Street testified that during the September 2004 meeting she asked Wilderspin "how do they accommodate with the Americans with Disabilities Act," and that Wilderspin told her that her "injury was an acute injury and that I would get over it and that it wouldn't apply to the Americans with Disabilit[ies] Act."  (*Id.* ¶ 47.)  Wilderspin's handwritten notes stated that she and Street "[d]iscussed no work clearance while in a wheelchair . . . is not under ADA but an acute injury."  (*Id.* ¶ 48.)  That same day, Street prepared a letter to the "Human Resources Representative" in which she requested that she "return to work at Ingalls in a Registered Nurse position" after "her short-term disability leave of absence due to a fracture of the distal femur."  (*Id.* ¶ 49; Pl.'s Stmt. Facts ¶ 34.)

### G.   Street's Recovery & Termination

On December 16, 2004, Street underwent a follow-up operation to remove the rod and

6

screws in her leg. (Pl.'s Stmt. Facts ¶ 42.) Dr. Earman provided a note on Street's behalf that stated: "Unable to work December 16th, 17th, and 20th, and may return to work with restrictions, with use of walker." (*Id.*) In January 2005, Street sought a medical note from Dr. Earman in conjunction with an RN Case Manager position at another hospital. (*Id.* ¶ 43.) Dr. Earman's note of January 24, 2005, indicated: "The patient should be able to return to work as a case manager. No lifting greater than 50 pounds, ambulation with walker or cane." (*Id.*)

Street's medical records reflect that on March 11, 2005, she was improving and that Dr. Earman noted: "Patient may return to work with assistance of walker or cane." (*Id*. ¶ 44; Def.'s Stmt. Facts ¶ 59.) Dr. Earman also prescribed a 3/8 inch lift for Street's right shoe. (Pl.'s Stmt. Facts ¶ 44.) Also in March 2005, Street "still required a walker, but was using a cane more, . . . occasionally out of the house," and was restricted to walking no more than 300 feet at a time. (Def.'s Stmt. Facts ¶ 60.) Street gave Dr. Earman's March 11, 2005, note to Christine Lopez in Ingalls' Human Resources Department after which Lopez contacted Wilderspin. (Pl.'s Stmt. Facts ¶¶ 46, 47.) Wilderspin's progress note states "discussed no restrictive duty program for personal injuries." (*Id*. ¶ 47.) On March 28, 2005, Ingalls sent Street a letter indicating that her leave of absence had exceeded one year and that pursuant to Ingalls' personnel policies, Ingalls was terminating Street's employment. (*Id*. ¶ 51, Def.'s Stmt. Facts ¶¶ 37, 61.)

H.     **Street's Continued Recovery After Termination**

On May 16, 2005, Dr. Earman's examination note stated: " I believe she could return to work. She's on a quad cane. Can't lift patients." (Pl.'s Stmt. Facts ¶ 27.) In December 2005, Street was still using a cane and – in Dr. Earman's opinion – she had a permanent restriction in the affected knee's range of motion. (*Id.* ¶¶ 23, 25, 28.) Dr. Earman also stated that Street's injured leg was one centimeter shorter than her other leg. (*Id.* ¶ 28.) On December 27, 2005, Dr. Earman

7

noted that Street had reached maximum medical improvement. (Def.'s Stmt. Facts ¶ 74.) Street's last visit to Dr. Earman was on December 27, 2005, at which time he released her. (*Id.* ¶ 75.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, ___ U.S. ___, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby*, 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

## ANALYSIS

"The Americans with Disabilities Act ("ADA") prohibits discrimination against 'a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Williams v. Excel Foundry & Mach., Inc.,* 489 F.3d 309, 310 (7th Cir. 2007) (quoting 42 U.S.C. § 12112(a)). To establish a claim for failure to accommodate a disability under the ADA, a plaintiff

8

must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability. *EEOC v. Sears, Roebuck & Co.,* 417 F.3d 789, 797 (7th Cir. 2005).

## I. Qualified Individual with a Disability

### A. Street's Disability

The Court first turns to the threshold question of whether Street is disabled under the ADA. To show that she is disabled within the meaning of the ADA, Street must present evidence that: (1) she has a physical or mental impairment that substantially limits one or more major life activities; (2) there is a record of such an impairment; *or* (3) Ingalls regards her as having an impairment that substantially limits one or more major life activities. *See Kampmier v. Emeritus Corp.,* 472 F.3d 930, 937 (7th Cir. 2007) (citing 42 U.S.C. § 12102(2)(A)-(C)) (emphasis added).

Street first argues that she has a physical impairment that substantially limits the major life activity of walking. *See* 42 U.S.C. § 12102(2)(A). The focal point of this inquiry involves the term "major life activities," which includes activities that "are of central importance to daily life," such as "walking, seeing, and hearing." *Cassimy v. Board of Educ. of Rockford Pub. Sch. Dist.,* 461 F.3d 932, 936 (7th Cir. 2006) (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)). To qualify as disabled under the ADA, a plaintiff must also show that the limitation on the "major life activity" is "substantial." *Toyota Motor Mfg.,* 534 U.S. at 195 (citing 42 U.S.C. § 12102(2)(A)). "Substantially limits" means that the plaintiff "is unable to perform a major life activity that the average person in the general population can perform or is significantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Kampmier,* 472 F.3d at 937; *see also* 29 C.F.R. § 1630.2(j)(1)(i)-(ii).

Here, Street contends that her fractured femur – which Ingalls refers to as a broken leg – substantially limits the major life activity of walking. In general, to determine if Street's fractured femur is a disability within the meaning of the ADA, the Court looks to "the nature and severity of the impairment, the duration and expected duration of the impairment, and the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment." *Kampmier,* 472 F.3d at 937; *see also Toyota Motor Mfg.,* 534 U.S. at 198 (impairment must be permanent or long term). Under this standard, the Seventh Circuit has determined that "[i]ntermittent, episodic impairments are not disabilities, the standard example being a broken leg." *Vande Zande v. State of Wis. Dep't of Admin.,* 44 F.3d 538, 544 (7th Cir. 1995) (citing 29 C.F.R. pt. 1630 app., § 1630.2(j); *see also Ogborn v. United Food & Commercial Workers Union,* 305 F.3d 763, 767 (7th Cir. 2002) (same).

Although the Seventh Circuit has considered a broken leg to be a non-chronic impairment with little or no long term impact, a court's assessment of whether an individual is disabled within the meaning of the ADA is fact-specific. *See Toyota Motor Mfg.,* 534 U.S. at 198 ("That the Act defines 'disability' with 'respect to an individual,' 42 U.S.C. § 12102(2), makes clear that Congress intended the existence of a disability to be determined in such a case-by-case manner."). Therefore, the Court turns to the specific facts of this case to determine whether Street had a physical impairment that substantially limited the major life activity of walking when she sought reasonable accommodation from Ingalls. *See Toyota,* 534 U.S. at 196; *see also Bay v. Cassens Transp. Co.,* 212 F.3d 969, 974 (7th Cir. 2000) (whether "individual meets the definition of a qualified individual with a disability is to be determined as of the time the employment decision was made.").

"To be disabled with regard to the major life activity of walking, the employee must be

'substantially limited' in her ability to walk, and the limitation must be permanent or long term, and considerable compared to the walking most people do in their daily lives." *EEOC v. Sears*, 417 F.3d at 802. Here, Street has presented evidence that during the relevant time period she was restricted to walking no more than 100 to 300 feet at a time with the assistance of either a wheelchair, walker, or cane. She has also presented evidence that she has a permanent restriction in the her knee's range of motion and that her injured leg is one centimeter shorter than her other leg. Accordingly, Street has presented evidence creating a genuine issue of material fact for trial that she was substantially limited in her ability to walk. *See id.* In other words, a reasonable jury could conclude that Street's difficulty in walking only 100 to 300 feet at a time "was a substantial limitation compared to the walking most people do daily." *Id.*[1]

### B.   Qualified Individual

Ingalls maintains that even if Street's fractured femur is considered a disability within the meaning of the ADA, Street is not a "qualified individual" under the first element of a failure to accommodate claim. A qualified individual with a disability is defined as follows:

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8). Based on this definition, the Seventh Circuit instructs that an "individual

---

[1] Because Street has presented evidence raising a genuine issue of material fact that she is disabled under 42 U.S.C. § 12102(2)(A), the Court need not address Street's contention that Ingalls regarded her as having an impairment that substantially limited the major life activity of walking. *See* 42 U.S.C. § 12102(2)(C); *see also Squibb v. Memorial Med. Ctr.,* 497 F.3d 775, 786 (7th Cir. 2007).

11

who cannot perform the essential functions of the job even with a reasonable accommodation to his disability by the employer is not 'qualified,' so the Act does not come into play." *Matthews v. Commonwealth Edison Co.,* 128 F.3d 1194, 1195 (7th Cir. 1997) (internal citation omitted). In determining whether an individual is "qualified" under the ADA, courts look to whether the individual: (1) satisfies the prerequisites of the job in terms of skills or experience; and (2) can perform the essential functions of the job with or without a reasonable accommodation. *See Branham v. Snow,* 392 F.3d 896, 904 (7th Cir. 2004) (citations omitted). As to the second requirement, Section 12111(8) unequivocally gives consideration to "the employer's judgment as to what functions of a job are essential" and "if an employer has prepared a written description .... this description shall be considered evidence of the essential functions of the job." *Jackson v. City of Chicago,* 414 F.3d 806, 811 (7th Cir. 2005). Street bears the burden of establishing that she is a "qualified individual." *See Bay*, 212 F.3d at 973.

Ingalls does not argue that Street is unqualified to be an RN Case Manager or registered nurse in terms of skills and experience. *See Branham,* 392 F.3d at 904. Instead, Ingalls maintains that as an RN Case Manager or nurse, Street was required to meet certain physical demands to perform the essential functions of her job. *See id.* ("[A]lthough a disability is not a permissible ground for assuming an inability to function in a particular context, the disability is not thrown out when considering if the person is qualified for the position sought."). Turning to the RN Case Manager job description, one of the demands that Ingalls deemed essential to the functions of the job includes the requirement that Street "[a]ssist patients of varying physical ability and size in the movements required for clinical care." In addition, the description required Street to "[p]erform clinical duties consistent with standard nurse practice," which included tasks such as assessing patients by taking patients' vital signs, hooking patients up to monitors, prepping wound sites, and

12

generally following the doctor's orders with regard to treatment.

Here, there is evidence in the record that at the time Street sought reasonable accommodation for her injury she could not lift more than 50 pounds, and as late as May 2005, Street was unable to move or lift patients. Accordingly, there is evidence in the record that Street could not perform some of the physical aspects of her job as an RN Case Manager or as a registered nurse without a reasonable accommodation. It is unclear from the record, however, whether Street could perform these functions with a reasonable accommodation. *See Matthews*, 128 F.3d at 1195.

Nevertheless, Street argues that Ingalls has a policy requiring disabled employees to be 100 percent healed or "released without restrictions" before they can return to work constituting a per se violation of the ADA. *See Hendricks-Robinson v. Excel Corp.,* 154 F.3d 685, 698 (7th Cir. 1998).[2] Put differently, Street contends that Ingalls' policy is a per se ADA violation because it does not allow for a case-by-case assessment of Street's ability to perform the essential functions of either the RN Case Manager or registered nurse positions with or without an accommodation. The Court agrees.

Regulations pertaining to the ADA expressly forbid an employer:

to use qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities, on the basis of disability, unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

---

[2] Ingalls addressed Street's argument about its alleged "released without restrictions" policy in a footnote in its reply brief. (R. 132-1, Reply Brief, at 2 n.1.) Generally, arguments raised in a footnote are waived. *See United States v. White,* 879 F.3d 1509, 1513 (7th Cir. 1989). Nonetheless, the Court requested supplemental briefing on this issue for the sake of judicial economy.

29 C.F.R. § 1630.10; *see also Hendricks-Robinson,* 154 F.3d at 698. "The purpose of this provision is to ensure that individuals with disabilities are not excluded from job opportunities unless they are actually unable to do the job." *Hendricks-Robinson,* 154 F.3d at 698 (quoting 29 C.F.R. Pt. 1630, App. § 1630.10); *see also* 29 C.F.R. § 1630.7 ("It is unlawful for a covered entity to use standards, criteria, or methods of administration, which are not job-related and consistent with business necessity" that "have the effect of discriminating on the basis of disability"). The ADA also requires an individualized assessment of an employee's capabilities. *Id.*; *see also Weigel v. Target Stores,* 122 F.3d 461, 466 (7th Cir. 1997) (ADA's "qualified individual" inquiry involves an individualized assessment of the employee and the relevant position). Based on these standards, the Seventh Circuit has held that employer policies requiring employees to be "100% healed" violate the ADA's requirement that employers must conduct a case-by-case assessment of an individual's ability to perform the essential aspects or functions of a job. *See Hendricks-Robinson,* 154 F.3d at 685; *see also McGregor v. National R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999) ("'100% healed' policies are per se violations of the ADA.").

Street argues that Ingalls has a policy that her doctor had to fully release her with no restrictions before she could return to work and that this policy is – in essence – a "100 percent healed" policy as prohibited by the ADA's regulations. More specifically, Street asserts that Ingalls' policy that excludes persons who have certain limitations – such as a need for a wheelchair, walker, or cane – is a per se violation of the ADA. In support of her argument, Street points to the deposition testimony of Pat Wilderspin, the Nurse Manager in Ingalls' Occupational Health Service who assists Ingalls' employees return to work. In her deposition, Wilderspin testified as to Ingalls' policy:

> If you are coming back for full duty and there is no restriction, you go right back to

> your position. ***If you are coming back and you are still treating for an acute injury and have an appliance, we do not clear you until you no longer need that.*** If you are coming back as documented for maximum medical improvement, we try to accommodate you and work with other departments to do that.

(R. 137-14, Def.'s Rule 56.1 Stmt., Wilderspin Dep. at 17) (emphasis added). Wilderspin also testified that this practice preceded her employment with Ingalls and that she started at Ingalls in 1971. (R. 121-2, Pl.'s Rule 56.1 Stmt., Ex. Z, Wilderspin Dep. at 6, 21.) Furthermore, Wilderspin testified that she received Dr. Earman's note explaining that Street could return to work with disability accommodations, specifically, that Street could return to work with a walker, cane, or wheelchair. (*Id.* at 19). Wilderspin then explained: "We do not set appointments [for a physical examination by an Ingalls' physician] because she was still clearing and treating for an acute injury while needing these appliances." (*Id.*)

Based on Wilderspin's deposition testimony, Street has presented evidence creating a genuine issue of material fact that Ingalls has a policy of not allowing employees to return to work after a personal injury if they needed appliances, namely, wheelchairs, canes, or walkers. *See Krawczyk v. del Re,* No. 98 C 6817, 2002 WL 1488865, at *3 (N.D. Ill. July 11, 2002) (plaintiff presented evidence creating issue of fact for trial that Sheriff's Department policy required plaintiff to obtain full medical release with no restrictions before he could return to work). Therefore, there are genuine issues of material fact whether Street is a qualified individual with a disability under the first element of her failure to accommodate claim. *See EEOC v. Sears,* 417 F.3d at 797.

## II.     Reasonable Accommodation

Because the parties do not dispute the second element of a failure to accommodate claim, namely, that Ingalls was aware of Street's disability, the Court turns to whether Ingalls failed to

reasonably accommodate Street's disability. *See id*. "Under the ADA, an employer must make 'reasonable accommodations' to a disabled employee's limitations, unless the employer can demonstrate that to do so would impose an 'undue hardship.'" *Id.* at 802 (quoting 42 U.S.C. § 12112(b)(5)(A)). As to this third element, once an employee puts her employer on notice of her disability, the "ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation." *Id.* at 797 (citation omitted). This interactive process "imposes a duty upon employers to engage in a flexible, interactive process with the disabled employee needing accommodation so that, together, they might identify the employee's precise limitations and discuss accommodation which might enable the employee to continue working." *Gile v. United Air Lines, Inc.,* 213 F.3d 365, 373 (7th Cir. 2000) (quoting *Hendricks-Robinson,* 154 F.3d at 693). The failure to engage in this interactive process is not a per se violation of the ADA. *See Rehling v. City of Chicago,* 207 F.3d 1009, 1016 (7th Cir. 2000). Instead, liability under the ADA attaches only if "the employer's failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation for the qualified individual." *Id.; see also EEOC v. Sears,* 417 F.3d at 797 ("employer will be liable only if it bears responsibility for the breakdown of the interactive process."). In making this determination, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *See Beck v. University of Wis. Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir. 1996) ("courts should attempt to isolate the cause of the breakdown and then assign responsibility.").

Street presents evidence creating a genuine issue of material fact that Ingalls was responsible for the breakdown of the interactive process. *See Rehling,* 207 F.3d at 1016. For example, Ingalls, via Wilderspin, did not consult with Street's doctor, Dr. Earman, about Street's

16

limitations or review Street's medical records when Street was a patient at Ingalls Memorial Hospital. (Pl.'s Rule 56.1 Stmt., Ex. Z, Wilderspin Dep. at 18-19.) Also, Wilderspin did not allow Street to go to the next stage under Ingalls' policy, namely, meeting with an Ingalls' physician, because Wilderspin determined that Street's injury was only acute – although from her deposition testimony it is not entirely clear how Wilderspin made this assessment outside of referring to Dr. Earman's notes. (*Id*. at 15-20; Def.'s Stmt. Facts ¶¶ 47, 48.) Moreover, Wilderspin admitted that if an employee returned to work without an accommodation but was still treating for an injury, the employee would be eligible for examination by an Ingalls' physician. (Wilderspin Dep. at 20.) Finally, there is no evidence in the record that Wilderspin met or even talked to Street after Street provided Dr. Earman's March 11, 2005 return to work note. (Pl.'s Stmt. Facts ¶¶ 46, 47.)

Based on the record before the Court, there is a genuine issue of material fact whether Ingalls failed to make a reasonable effort to determine what specific accommodations were necessary under the circumstances, and thus whether Ingalls was responsible for the breakdown of the interactive process. *See Beck*, 75 F.3d at 1135. Accordingly, the Court denies both Street's and Ingalls' motions for summary judgment.

## **CONCLUSION**

For these reasons, the Court denies both Defendant's Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment.

**Dated:** January 17, 2007

                                        **ENTERED**

                                   _____
                                   **AMY J. ST. EVE**
                                   **United States District Court Judge**